NOTICE: This opinion is subject to modification resulting from motions for reconsideration under Supreme Court Rule 27, the Court's reconsideration, and editorial revisions by the Reporter of Decisions. The version of the opinion published in the Advance Sheets for the Georgia Reports, designated as the "Final Copy," will replace any prior version on the Court's website and docket. A bound volume of the Georgia Reports will contain the final and official text of the opinion.

In the Supreme Court of Georgia

Decided: March 17, 2026

S26A0465.  JACKSON v. THE STATE.

WARREN, Presiding Justice.

Appellant Devon Jackson was convicted of malice murder and other crimes in connection with the beating death of Keonta Metts.[1] Jackson's sole claim on appeal is that the trial judge abused her discretion by removing him from the courtroom due to his disruptive behavior during his trial, which, he argues, violated his rights under the United States Constitution to be present at trial and to testify

---

[1] Metts was killed on May 8, 2019.  In December 2020, a DeKalb County grand jury indicted Jackson for malice murder, two counts of felony murder, three counts of aggravated assault, armed robbery, and possession of a knife during the commission of a felony.  At a trial from April 17 to 21, 2023, the jury found him guilty of all counts.  The trial court sentenced him to serve life in prison without the possibility of parole for malice murder, 10 concurrent years for armed robbery, and 5 consecutive years for the weapons offense.  The remaining counts were vacated or merged.  Jackson filed a timely motion for new trial, which he amended in May 2025.  After an evidentiary hearing, the trial court denied the motion on July 9, 2025. Jackson filed a timely notice of appeal, and the case was docketed to the term of this Court beginning in December 2025 and submitted for a decision on the briefs.

in his own defense. As explained below, that claim fails, so we affirm.

1. As pertinent to Jackson's only claim, the record shows the following. At a pretrial hearing on the Friday before Jackson's trial was set to begin on Monday, April 17, 2023, Jackson asked to address the trial judge and began to express concern about his trial counsel's ability to represent him. The judge instructed Jackson and his lawyer to approach the bench; there was an off-the-record discussion; and the judge announced that Jackson's trial counsel was "capable of representing" Jackson and that the trial could "still stay on the calendar."

Jackson's trial began as planned on April 17. After the State presented its case-in-chief over the course of a few days, the defense called Jackson to testify. When Jackson's trial counsel began his direct examination, Jackson interrupted: "First off, I would like to let the record—." The lead prosecutor objected, and the trial judge had the jury removed from the courtroom as Jackson continued, saying that he "told [the judge] that [his] public defender is not all

2

reflecting and doing what he's supposed to do as a public defender," and the judge "did not appoint [him] another attorney … and forced [him] to go to trial." Deputies eventually "escorted" Jackson from the courtroom, as he repeatedly said, "Get off me."

The lead prosecutor then recounted for the record what had happened, saying that Jackson "immediately began reading from a sheet of paper"; the jury was removed; "deputies had to physically restrain … Jackson"; "[h]e was not tased, but a deputy did have to take out a TAS[ ]ER"; he was escorted "to the back"; and "[s]ince that time, he's been making noise in the back." The trial judge added that "[f]or safety purposes," she "left the bench" during the incident.

The trial judge had Jackson escorted back into the courtroom and said, outside the presence of the jury: "Mr. Jackson, I'm going [to] give you a couple of choices. One is that … you can behave yourself, not have any additional outbursts and you can remain in the courtroom. The other, if you cannot—." Jackson interrupted: "This man [Jackson's trial counsel] came to the jail and said I'm guilty. I came to you and told you-all out loud on Friday. You forced

3

me to go to trial. Now you want me to be polite and pleasant with you when I asked and told you to remove his a\*\*—." A deputy tried to interrupt, repeatedly saying, "Sir," as Jackson said, "So why am I up here?" At that point, Jackson was again "escorted out of the courtroom."

Although the trial judge then said, "We'll be proceeding without him," she told the lawyers that she planned to determine if Jackson had "cool[ed] off" after a lunch break.[2] After the break, Jackson was brought to the courtroom again, and the trial judge said, outside the presence of the jury, "[I]n order to remain in court,

---

[2] The trial judge also told the lawyers that during the break, she would "research" whether Jackson's disruptive conduct meant that he had forfeited his right to testify. And after the break, the judge, outside the presence of the jury, explained to the lawyers that *Haynes v. State*, 356 Ga. App. 631 (2020), instructed that a defendant can lose his right to be present at trial if, after he has "been warned by the judge that he will be removed" if he continues his disruptive behavior, he "nevertheless insists on conducting himself in a manner so disorderly, disruptive, and disrespectful" of the court that his trial cannot be carried on with him in the courtroom. The judge noted that *Haynes* said that the right to be present can be reclaimed as soon as the defendant "is willing to conduct himself consistently with the decorum and respect" inherent in the concepts of courts and judicial proceedings. See *Haynes*, 356 Ga. App. at 641–42 (citing *Illinois v. Allen*, 397 US 337 (1970)). She then said that she planned to bring Jackson back to the courtroom to "make sure that he understands that if he doesn't conduct himself properly, he won't have the opportunity to testify."

4

you have to conduct yourself in an orderly manner. And so you were—at the time of your outburst when the court instructed on a couple of occasions to stop, you did not stop. Is it your intent to be disruptive in this courtroom? I need an affirmative [response]." Jackson responded that if the judge recused herself and appointed him new counsel, he would "politely do what [she said]."

The trial judge said, "Okay. So you were in the middle of testifying. Do you understand that if you do not—." Jackson interrupted: "Are you going to re[cuse] yourself?" When the judge asked what Jackson was alleging she did, he replied that he "told" her that his trial counsel "came to the jail … saying that [Jackson was] guilty," and the judge "forced [Jackson] to trial." The judge said, "Okay, so what I'm asking you now is: Do you want[ ] to continue to testify?" Jackson then asked to "go back to the jail." The trial judge told Jackson that if he did that, he would be "waiving [his] right to continue to testify," and Jackson replied, "I'm not waiving my right. I did. You cut me off when I was testifying." When the judge asked if Jackson was going to remain in the

5

courtroom for his trial, he responded, "I'm still going to say what I'm going to say off the paper that I wrote. So if that's what you want, if you're going to let me [be] here and no one [will] be objecting or anything, yes."

The trial judge instructed Jackson that he could not read his testimony and that he would be required to answer the lawyers' questions. The judge then said to Jackson, "You need to indicate whether you're going to follow the courtroom decorum or not. Are you going to continue to testify, 'Yes' or 'No,' sir?" Jackson said, "Testify." The following exchange then took place:

> [THE JUDGE]: Are you going to do so without disrupting; that is, you're not going to be reading from the paper, you're going to answer questions from the State as well as from … the defense?
>
> [JACKSON]: Okay.
>
> [THE JUDGE]: Do you understand that if you do not do so, then that means you're going to be in contempt of court. Do you understand that.
>
> [JACKSON]: Okay.
>
> [THE JUDGE]: Okay. So that's what you're going to do. Are you going to be disruptive?

[JACKSON]: You asked me this already. Why do you keep asking me this. You get me more upset.

A deputy interrupted, saying: "You're not going to sit here and talk to the judge like that. Do you understand me?" The exchange between the trial judge and Jackson continued:

[JACKSON]: Why are you asking me the same things over and over?

[THE JUDGE]: Sir, are you going to be—

[JACKSON]: I answered that.

[THE JUDGE]: Answer it "Yes" or "No."

[JACKSON]: I answered it already.

[THE JUDGE]: Okay, you're not going to be disrespectful to the court.

[JACKSON]: Okay. Well, then stop asking me the same questions.

[THE JUDGE]: Okay, thank you so much. At this point[,] the court finds that you will remain disruptive, alright; and, therefore, for the purposes of this trial, the court will remove you. Here's what I'm going to do: I'm going to take you downstairs. We're going to continue this trial without you. At any point in time you believe that you can do so without being disruptive, you'll let a deputy know and we'll bring you back up; but you cannot come and be

7

disruptive.  You cannot come and say what you want to do.  Do you understand that?

[JACKSON]: Take me back.

[THE JUDGE]: At some point if you decide that you wish to do so, without being disruptive, you can let us know and we'll bring you back up.  Do you understand that?

[JACKSON]: I don't need to be brought back.  I need to be taken back to the facility, which they were getting ready to do.  I was calmed down until you-all brought me back in here.

[THE JUDGE]: So we'll take you back to the facility if that's your request.  Alright, take him back where he wants to go.

Jackson left the courtroom; the jury was brought in; and the defense rested. After a charge conference, the proceedings concluded for the day.

When the trial began again the next morning, the trial judge had Jackson brought back to the courtroom.  She informed him, outside the presence of the jury, that closing arguments were going to begin and asked if he wished to be present.  When he said, "Yes," the judge asked if he understood that he had to "conduct [him]self in a proper manner."  He said, "Understood."  After the judge and

8

counsel discussed certain jury charges, Jackson's counsel said there was "some confusion here" because "Jackson was hoping to testify at this time." Jackson then said that he had been "told" that the judge "wanted to revisit and see if [Jackson] wanted to testify again[.]" The trial judge explained that because the defense had rested, Jackson's "case [was] closed." She then asked if Jackson was going to stay for closing arguments, and he said that he would.

The jury entered the courtroom, and when the lead prosecutor began to speak, Jackson interrupted, claiming that his counsel "came up to the jail [and] said that [he] was guilty"; Jackson told the trial judge to "appoint [him] another attorney"; "[s]he refused to do so"; and "[t]his is a trial slam [sic]. She know[s] she is wrong and [Jackson] told her that numerous [ ] times—." While Jackson spoke, the jury was taken out of the courtroom. Jackson was also eventually "escorted" from the courtroom. The trial judge stated for the record that Jackson "took the microphone, placed it in his hand and started indicating that his rights were violated"; "[t]he deputies had to escort him out of the courtroom"; and Jackson "was resisting

9

moving out of the courtroom."

The jury was brought back to the courtroom, and the trial proceeded with closing arguments and the jury charge. After the parties were informed that the jury reached a verdict, Jackson's counsel asked if the trial judge wanted "to see if … Jackson wishes to be a part of this proceeding." The judge said: "I think he has waived his right to be a part of the proceedings at this juncture. We can't have him acting out. He has already acted out on three occasions. I think he has made it very clear he is not going to behave and just for security purposes I am not going to do that at this time." The jury verdict was then published, and the trial concluded.

At the hearing on Jackson's motion for new trial, one of the prosecutors at Jackson's trial testified for the State about Jackson's behavior; his testimony was largely consistent with the record, as set forth above. He added, however, that during Jackson's first outburst at the beginning of his testimony, Jackson "grabbed the microphone" at the witness stand, "increased his pitch," and "tensed up," such that the court deputy turned his attention from escorting

10

the jurors out of the courtroom to addressing Jackson "because there was a security issue"; the deputy "got right on top of [Jackson] to physically restrain him," but Jackson did not submit to the deputy's commands; Jackson pulled the microphone sideways as he continued to speak; the deputy called for assistance; and three or four additional deputies came into the courtroom, "grabb[ed]" Jackson, and "pulled him" through a side door to a holding cell. The prosecutor also said that Jackon continued to "yell[ ]" from the holding cell, so he was eventually taken to another holding area in the basement. In addition, the prosecutor testified that when the trial judge spoke to Jackson after the lunch break, he was "interrupt[ing]" her and "talk[ing] over her." And finally, the prosecutor noted that when Jackson had another outburst in front of the jury at the beginning of closing arguments, he "had both hands wrapped around the microphone"; he "pulled the microphone's felt cover off" while deputies tried to remove him; and he "had to be

11

manhandled back out into the inmate door."[3]

In its order denying Jackson's motion for new trial, the trial judge found that she "properly exercised [her] discretion in removing [Jackson] from the courtroom" because he "repeatedly acted out, both verbally and physically, he was warned each time, and his trial could not be carried on with him in the courtroom." The judge concluded, in pertinent part, that although Jackson was given "every opportunity to remain in the courtroom and testify," "he persisted in his disruptive behavior," such that "[t]he loss of his opportunity to testify was attributable solely to [Jackson]."

2. Jackson contends that the trial judge abused her discretion by removing him from the courtroom during the trial, such that his rights under the United States Constitution to be present at trial

---

[3] After the prosecutor testified, Jackson's motion for new trial counsel asked the trial judge to put on the record her recollection of an ex parte meeting she had with Jackson and his trial counsel on the day before Jackson's first outburst. The judge said that trial counsel asked for the meeting because he was concerned that Jackson was going to attempt to testify about his "issues" with counsel; the judge explained to Jackson that "he could not do that"; and the judge told Jackson that trial counsel was "a good attorney" who would "protect his interest."

and to testify in his own defense were violated.[4]  This claim fails.

Although a criminal defendant has a constitutional right to be present during the critical stages of his trial, this right is not absolute.  See *Illinois v. Allen*, 397 US 337, 343 (1970).  As the United States Supreme Court has explained:

> [A] defendant can lose his right to be present at trial if, after he has been warned by the judge that he will be removed if he continues his disruptive behavior, he nevertheless insists on conducting himself in a manner so disorderly, disruptive, and disrespectful of the court that his trial cannot be carried on with him in the courtroom. Once lost, the right to be present can, of course, be reclaimed as soon as the defendant is willing to conduct himself consistently with the decorum and respect inherent in the concept of courts and judicial proceedings.
>
> It is essential to the proper administration of criminal justice that dignity, order, and decorum be the hallmarks of all court proceedings in our country.  The flagrant disregard in the courtroom of elementary standards of proper conduct should not and cannot be tolerated.  We believe trial judges confronted with disruptive, contumacious, stubbornly defiant defendants must be given sufficient discretion to meet the circumstances of each case.

*Allen*, 397 US at 343 (cleaned up).  See also, e.g., *Kerns v. State*, ___

---

[4] Jackson raises no claims under the Georgia Constitution.

13

Ga. ___ (2026), S25A1115, slip op. at 18 (Ga. Feb. 3, 2026) (2026 WL 270943). The United States Supreme Court went on to explain that one of the "constitutionally permissible ways for a trial judge to handle an obstreperous defendant" is to "take him out of the courtroom until he promises to conduct himself properly." *Allen*, 397 US at 343–44.

And although it appears that neither the United States Supreme Court nor this Court has expressly addressed a criminal defendant's claim that his right to testify was violated by his removal from the courtroom after he disrupted his trial proceedings, the federal circuit courts that have evaluated the issue have applied the principles set forth in *Allen*. See, e.g., *United States v. Evans*, 908 F3d 346, 355 (8th Cir. 2018) (citing *Allen* and explaining that the defendant forfeited his right to testify after repeatedly disrupting his trial); *United States v. Nunez*, 877 F2d 1475, 1477–78 (10th Cir. 1989) (applying the principles in *Allen* to evaluate the defendant's claim that the trial court's decision to remove him from his trial due to his disruptive behavior violated his constitutional

14

right to testify and explaining that "the right to testify is not absolute … and may be waived by contumacious conduct" (quotation marks omitted)).

Applying *Allen*'s framework here, we conclude that, under the circumstances presented in this case, the trial judge did not abuse her discretion by removing Jackson from the courtroom and determining that, by continuing to disrupt the proceedings, he forfeited his right to testify. To begin, the record, as set out in detail above, shows that when Jackson took the witness stand to testify, he immediately interrupted counsel's first question, grabbed the microphone, and began to read a speech about his frustrations with counsel. As he read, he "increased his pitch" and "tensed up," which led the courtroom deputy to turn his attention to the "security issue"; the judge left the bench "[f]or safety purposes"; and the deputy tried to physically restrain Jackson but had to call additional deputies for assistance because Jackson refused to yield. It took three or four deputies—and threats to use a stun weapon on Jackson—to eventually forcibly remove him from the courtroom and into a

15

holding cell, where he continued to "yell[ ]." In light of the serious and legitimate security concerns that Jackson's behavior posed, there was no abuse of discretion in his immediate removal from the courtroom. See *State v. Fletcher*, 252 Ga. 498, 501 (1984) (explaining that "[a]lthough *Illinois v. Allen* … conditions the right to remove a defendant from the courtroom upon a warning being given, the conduct of a defendant may be so violent that a warning would be a totally useless act" and that "[a] trial judge must have discretion to act immediately in the face of extreme violence and disruption"). See also, e.g., *United States v. Ward*, 598 F3d 1054, 1059 (8th Cir. 2010) (explaining that "[a] trial judge with a legitimate concern for safety in the courtroom … clearly has discretion to take firm action").

And consistent with the United States Supreme Court's direction in *Allen*, the trial judge then had Jackson brought back to the courtroom and warned him that he could "remain in the courtroom" if he did "not have any additional outbursts." Yet Jackson persisted in his disorderly behavior—interrupting the

judge, complaining about his issues with counsel, and using vulgar language—and was removed from the courtroom again as a result. After a lunch break, the judge had Jackson brought to the courtroom again; warned him a second time that "to remain in court," he would be required to "conduct [him]self in an orderly manner"; and tried to elicit from Jackson assurances that he would properly conduct himself in court and that he would answer questions from counsel, rather than read a prepared speech, during his testimony. But Jackson repeatedly interrupted the judge, continued to complain about his counsel, and refused to answer the judge's questions about whether he would remain disruptive, so he was removed from the courtroom again and instructed that he could return if "[a]t any point in time," he believed that he could "do so without being disruptive."[5] The trial judge provided Jackson a third opportunity to rejoin the proceedings the next day, again warning him that he had to "conduct [him]self in a proper manner." And although

---

[5] Although Jackson's primary argument in his appellate brief is that this was the first time that the trial judge warned him that he would be removed if he continued his disruptive behavior, that assertion is belied by the record.

Jackson asked the trial judge whether he could testify at that point, the judge explained to him that he had forfeited his right to testify and that the evidence was closed, and neither Jackson nor his counsel asked to reopen the evidence. When the jury then entered the courtroom and closing arguments began, Jackson immediately interrupted the proceedings again to complain about the judge and his counsel and had to be forcibly removed by deputies a fourth (and final) time. The record does not indicate that Jackson ever asked to rejoin the proceedings.

Under these circumstances, we conclude that Jackson's persistent conduct was "so disorderly, disruptive, and disrespectful" that the trial judge was authorized to determine that the trial could not continue while Jackson was present in the courtroom. *Allen*, 397 US at 343. Despite two clear warnings from the trial judge that Jackson would be removed from the courtroom if he insisted on conducting himself in such a manner and repeated attempts to encourage Jackson to promise that he would behave properly if he continued his testimony, see *Allen*, 397 US at 343–44, Jackson

18

maintained his contumacious conduct and thus forfeited his right to testify, see, e.g., *Evans*, 908 F3d at 352–55. And when given yet another chance to return to the courtroom for closing arguments (along with another warning about his behavior), Jackson persisted in flagrantly disregarding "elementary standards of proper conduct" in court and lost his right to be present for the remainder of the proceedings. *Allen*, 397 US at 343.

In sum, the trial judge did not abuse her discretion by removing Jackson from the courtroom during a portion of his trial and concluding that, as a result of his disruptive conduct, he forfeited his rights to be present and to testify in his defense. See *Kerns*, S25A1115, slip op. at 20–21 (holding that the trial court did not abuse its discretion by removing the defendant, after a warning, because he continued to disrupt the proceedings to complain about his trial counsel, and noting that "[a] defendant's right to counsel may not be insisted upon in a manner that will obstruct an orderly procedure in courts of justice[ ] and deprive such courts of the exercise of their inherent powers to control the same" (quotation

19

marks omitted)); *Haynes v. State*, 356 Ga. App. 631, 642 (2020) (holding that the trial court did not abuse its discretion by removing the defendant, after warning him that he would be removed if he continued to be disruptive, because he repeatedly argued with the court, including about issues with his trial counsel; refused to answer the judge's questions; and repeatedly interrupted the judge). See also *Evans*, 908 F3d at 352–55 (holding that the trial court did not abuse its discretion by removing the defendant and concluding that he had forfeited his right to testify after he took the stand and "immediately started complaining" about his attorney; he was warned to limit his responses to answering counsel's questions; he told the court that he would nevertheless continue to lodge his complaints; and when the court asked a final time if he would change his mind, "he responded with another rant"); *Nunez*, 877 F2d at 1478 (rejecting the defendant's claim that the trial court violated his rights to be present and to testify in his own defense where the defendant was warned several times that he would be removed from the courtroom if he continued his "outburst[s]," but he nevertheless

continued to interrupt the proceedings; and noting that "[a] court should, of course, vigilantly protect a defendant's constitutional rights, but it was never intended that any of these rights be used as a ploy to frustrate the orderly procedures of a court in the administration of justice" (quotation marks omitted)).

*Judgment affirmed.  All the Justices concur.*